**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 2 4 2026

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

ERIC ORWOLL,
PETER JULIUS CSERE,
and
SCOTT THOMAS HALLOWOOD,
Plaintiffs,

v.

Case No. 3:26-cv-00216 LPR

SKY UK LIMITED,
a private limited company organized
under the laws of England and Wales;
COMCAST CORPORATION,
a corporation organized under the laws
of the Commonwealth of Pennsylvania;
and
TOM CHESHIRE,
Defendants.

This case assigned to District Judge RUDOFSKY
and to Magistrate Judge HARRIS

**COMPLAINT AND JURY DEMAND**

Plaintiffs Eric Orwoll, Peter Julius Csere, and Scott Thomas Hallowood (collectively, "Plaintiffs"), by and through their undersigned counsel, for their Complaint against Defendants Sky UK Limited ("Sky UK"), Comcast Corporation ("Comcast"), and Tom Cheshire ("Cheshire") (collectively, "Defendants"), state as follows:

**NATURE OF THE ACTION**

1. This is an action for defamation, false light invasion of privacy, tortious interference with business relations, and civil conspiracy arising from a documentary video published by Defendants on July 21, 2025, on the Sky News YouTube channel. The documentary, titled "Inside the US community building a 'fortress for the white race' | 'Return to the Land'" (the "Documentary"), contains multiple false statements of fact, including an entirely fabricated photograph — a red spray-painted logo and a "WHITES ONLY" text were digitally created in post-production and do not depict any actual condition on the property — misattributed social

media posts, and deliberately misleading editing, all of which have caused severe and ongoing harm to Plaintiffs.

2. Defendants invited themselves into Plaintiffs' homes and community under the pretense of producing a fair and balanced report. Instead, Defendants produced a hit piece containing fabricated evidence and then used the Documentary to trigger government investigations against Plaintiffs, causing hundreds of thousands of dollars in legal fees, severe reputational harm, and ongoing emotional distress.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3) because the action is between citizens of different States and citizens or subjects of a foreign state are additional parties. Plaintiffs are citizens of Arkansas. Defendant Comcast is a citizen of Pennsylvania (its State of incorporation) and of Pennsylvania (the State of its principal place of business at One Comcast Center, 1701 JFK Boulevard, Philadelphia, Pennsylvania 19103). Defendants Sky UK and Cheshire are citizens of the United Kingdom. The amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

4. This Court has personal jurisdiction over Defendant Cheshire pursuant to Arkansas Code Annotated § 16-4-101(B) (the Arkansas long-arm statute, applied under Federal Rule of Civil Procedure 4(k)(1)(A)) because he physically entered Sharp County, Arkansas, together with a photographer and a producer also employed by Sky News (three Sky News employees in total), to conduct the reporting that forms the basis of this lawsuit, and he directed intentional tortious conduct at Plaintiffs, who are residents of Sharp County. The exercise of personal jurisdiction over Cheshire comports with the Due Process Clause of the Fourteenth Amendment because Cheshire purposefully directed his activities at Arkansas residents and the claims arise from those activities.

5. This Court has personal jurisdiction over Defendant Sky UK pursuant to Arkansas Code Annotated § 16-4-101(B) (applied under FRCP 4(k)(1)(A)) because it directed three of its employees — Cheshire, a photographer, and a producer — to Sharp County, Arkansas, to conduct the reporting; published defamatory content about Sharp County residents and a Sharp County community; and distributed that content to audiences worldwide, including Arkansas, via YouTube and other platforms accessible in this state.

6. Defendants purposefully directed their own conduct at Arkansas, and Plaintiffs' claims arise directly from that conduct. Cheshire and two other Sky News employees physically traveled to Sharp County, Arkansas, to conduct the reporting that forms the basis of this action; Defendants solicited a statement from and made a referral to the Arkansas Attorney General, Arkansas's chief law-enforcement officer, for the purpose of triggering an Arkansas government investigation of Arkansas residents; and Defendants published and distributed the Documentary and the Written Article into Arkansas through YouTube, news.sky.com, and other platforms accessible in and streamed into this State. These are Defendants' own contacts with the State of Arkansas, not merely the location where Plaintiffs reside or where they felt harm.

7. This Court has personal jurisdiction over Defendant Comcast because it is a United States corporation doing business in all fifty states, including Arkansas; it is the ultimate parent company of Sky UK and exercises control over Sky UK's operations; and it distributes Sky News content to United States audiences through multiple platforms, including Peacock, Pluto TV, Samsung TV Plus, and MSNBC. Comcast is registered to do business in Arkansas and has sufficient minimum contacts with this State to satisfy due process.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Sharp County,

Arkansas, which is within the Eastern District of Arkansas, Northern Division. Venue is also proper as to the foreign defendants pursuant to 28 U.S.C. § 1391(c)(3).

## PARTIES

9. Plaintiff Eric Orwoll is a natural person and citizen of Arkansas, residing in Ravenden, Sharp County, Arkansas. He resides on property near Ravenden that was the subject of the Documentary. He was the primary interview subject in the Documentary.

10. Plaintiff Peter Julius Csere is a natural person and citizen of Arkansas, residing in Ravenden, Sharp County, Arkansas. He resides on the same property that was the subject of the Documentary. He was interviewed in and is specifically identified and discussed in the Documentary.

11. Plaintiff Scott Thomas Hallowood is a natural person and citizen of Arkansas, residing in Ravenden, Sharp County, Arkansas. He resides on the same property that was the subject of the Documentary. He was interviewed in and is specifically identified and discussed in the Documentary.

12. Defendant Sky UK Limited ("Sky UK") is a private limited company incorporated in England and Wales (Company No. 02906991), with its registered office at Grant Way, Isleworth, Middlesex TW7 5QD, United Kingdom. Sky UK is a citizen of the United Kingdom for diversity jurisdiction purposes. Sky UK operates the Sky News television channel and the Sky News YouTube channel (https://www.youtube.com/@SkyNews), through which the defamatory Documentary was published and remains publicly accessible.

13. Defendant Comcast Corporation ("Comcast") is a publicly traded corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at One Comcast Center, 1701 JFK Boulevard, Philadelphia, Pennsylvania 19103.

Comcast is a citizen of Pennsylvania for diversity jurisdiction purposes. See 28 U.S.C. § 1332(c)(1). Comcast is the ultimate parent company of Sky UK, having acquired Sky plc (now Sky Group Limited) in 2018 for approximately forty billion dollars ($40,000,000,000). Comcast exercises control over Sky UK through its subsidiary Sky Group Limited. Comcast distributes Sky News content to United States audiences through its subsidiaries, including NBCUniversal, which has simulcast Sky News on MSNBC and NBC News Now.

14. Defendant Tom Cheshire ("Cheshire") is a natural person and citizen of the United Kingdom. Cheshire is a journalist employed by Sky News who produced and presented the defamatory Documentary. Cheshire personally traveled to Sharp County, Arkansas, in or about May 2025, where he conducted interviews with Plaintiffs and other residents of the Wisdom Woods LLC property. Upon information and belief, Cheshire maintains a correspondence address at 414 162-168 Regent Street, London, England, W1B 5TE (per UK Companies House records, Company No. 11951998), and is employed at Sky Central, Grant Way, Isleworth, Middlesex TW7 5QD, United Kingdom.

## FACTUAL ALLEGATIONS

15. Return to the Land ("RTTL") is a nationwide unincorporated private membership association with over one thousand two hundred (1,200) members. RTTL is a separate organization from Wisdom Woods LLC and is not a legal entity — it is an unincorporated association.

16. Wisdom Woods LLC is an Arkansas limited liability company that owns approximately 160 acres of land near Ravenden, Sharp County, Arkansas. Wisdom Woods LLC is not called "Return to the Land." It is a separate entity with separate governance, separate membership, and separate operations.

17. Approximately forty (40) people reside on the Wisdom Woods LLC property. The

community is engaged in homesteading, agriculture, and rural living. Plaintiffs are among those residents.

18. In or about March 2025, Defendant Cheshire contacted Plaintiff Orwoll and requested permission to visit the Wisdom Woods LLC property to produce a report for Sky News.

19. Plaintiffs invited Cheshire and his camera crew to visit the property in good faith, believing that Sky News intended to produce a fair and balanced report about their homesteading community and its celebration of European heritage and traditional American families.

20. Cheshire and his crew spent approximately three (3) days on the Wisdom Woods LLC property in Sharp County, Arkansas, during which time they conducted extensive interviews with Plaintiffs and other residents, filmed the property and its surroundings, and were given unrestricted access to the community.

21. At no time during the visit did Plaintiffs or any resident display, create, or possess any signage reading "Whites Only" or any similar phrase on any tree, building, or other surface on the property.

22. On July 22, 2025, Defendants published the Documentary on the Sky News YouTube channel at the URL https://www.youtube.com/watch?v=kBYBwILYTpM. The Documentary is approximately twenty-seven (27) minutes in length and is titled "Inside the US community building a 'fortress for the white race' | 'Return to the Land.'"

23. As of July 22, 2026, the Documentary has been viewed 1,898,468 times and has received over 30,000 "likes" on YouTube. The Documentary remains publicly accessible and continues to accumulate views.

24. The Documentary is also available through other platforms controlled by Defendants, including the Sky News website (news.sky.com), and has been simulcast or referenced on

Comcast-owned platforms including MSNBC and NBC News Now.

25. In addition to the Documentary, Defendants published a separate written longform article on the Sky News website at the URL https://news.sky.com/story/return-to-the-land-inside-the-whites-only-settlement-in-arkansas-the-group-building-a-fortress-for-the-white-race-13399875 (the "Written Article"). The Written Article, authored by Defendant Cheshire and published on or about July 21, 2025, contains the same defamatory characterizations as the Documentary, including the title "Inside the whites-only settlement in Arkansas — The group building a 'fortress for the white race,'" the same misattributed X Post ("We started a Whites only community"), and additional original photographs taken on Plaintiffs' property during Defendants' visit. The Written Article constitutes a separate act of publication for defamation purposes.

26. The Written Article and Documentary were produced by a team of at least eleven (11) Sky News personnel: reporters Tom Cheshire, Maz Poynter, and Chris Gordon; editor Chris Howard; production staff Maz Poynter, Sara Thompson, Kaitlin Tosh, Kate Schneider, and Michael Drummond; and graphics staff Taylor Stuart, Annie Adam, and Reece Denton. The graphics team is responsible for the post-production digital manipulation that created the Doctored Photo described below. The scale of this production team — three reporters, an editor, five production staff, and three graphics specialists — demonstrates that the Documentary was a major editorial undertaking, not a hasty news report, and that the Doctored Photo was a deliberate editorial decision reviewed and approved by multiple personnel.

**False Statement No. 1 — The Entirely Fabricated "Whites Only" Photograph**

27. No tree on the Wisdom Woods LLC property bears — or has ever borne — a red spray-painted RTTL logo with the words "Whites Only" or any similar text. The image depicted in the Documentary showing a tree with a red spray-painted RTTL logo and "WHITES ONLY" text (the

"Doctored Photo") does not correspond to any actual condition on the property. The entire image — both the red spray-painted logo and the "WHITES ONLY" text — was digitally fabricated in post-production.

28. The bark grain pattern visible on the tree in the Doctored Photo is identical in every respect to the bark grain pattern on the actual tree on the Wisdom Woods LLC property that bears a small red metal cutout of the RTTL logo nailed to its trunk. This confirms with virtual certainty that Defendants used a photograph of this specific tree as the base image for the fabrication. In post-production, Defendants digitally removed the metal cutout logo and replaced it with an entirely fabricated image — a red spray-painted RTTL logo bearing the superimposed words "WHITES ONLY" in large white capital letters. Neither element exists on the property. Both were created digitally. To make the fabrication appear photo-realistic, Defendants employed multiple sophisticated digital manipulation techniques designed to deceive viewers into believing the image depicted an actual physical condition on the property:

- **Bark texture overlay:** A bark grain pattern matching the underlying oak tree was applied to both the fabricated red spray-painted logo and the "WHITES ONLY" text, mimicking the appearance of paint that has been physically absorbed into the bark surface;

- **Edge feathering and opacity reduction:** The edges of the fabricated red spray-painted logo display decreased opacity and feathered edge treatment — telltale signs of digital compositing — designed to simulate the irregular absorption pattern of spray paint on rough bark. The logo is implausibly well-centered on the tree trunk, with symmetrical placement inconsistent with the imprecise nature of actual spray-paint application in the field;

- **Chromatic aberration effect:** Cyan/teal color fringing was applied across the entire composite image, including both the fabricated spray-painted logo and the "WHITES ONLY" text, simulating camera lens artifacts and further disguising the digital manipulation as an in-camera photograph.

29. These manipulation techniques, analyzed by a qualified graphic designer, are consistent with professional post-production software such as Adobe Photoshop or AI-generated image compositing, and are inconsistent with an unaltered photograph of an actual physical condition.

30. The Doctored Photo is not labeled as an illustration, graphic, or artistic rendering. It contains no caption, watermark, disclaimer, or any other indication that it has been digitally altered. It is presented as a photograph of an actual condition on the property.

31. The Doctored Photo appears in the Documentary at least three times:

- As the **YouTube thumbnail** — the preview image displayed to all viewers before they click on the video, and the first visual impression received by the Documentary's audience of nearly two million viewers;

- At approximately **2:08** in the Documentary, displayed as a full-screen image immediately following a video clip of Plaintiff Orwoll being interviewed on the property, during a musical interlude before the next segment — presented without any narration, caption, or disclaimer indicating alteration;

- At approximately **26:48** in the Documentary, displayed again as a full-screen image during the narrator's closing conclusion, while the narrator states: "And once set alight, who knows how fiercely it will burn and who the flames will touch" — pairing the fabricated image with ominous language suggesting danger and

extremism.

32. At approximately **7:37** in the Documentary, Defendants show the same tree on the property — bearing its actual, unaltered small red metal cutout of the RTTL logo nailed to its trunk — while the narrator states: "The group's logo based on a Nordic rune draws on that heritage." The bark grain pattern on this tree is identical in every respect to the bark grain pattern on the tree in the Doctored Photo, confirming with virtual certainty that this is the same tree that was digitally manipulated to create the Doctored Photo. The footage at **7:37** shows what the tree actually looks like: a simple metal cutout logo, with no spray paint and no "Whites Only" text. Even this footage, however, was digitally altered — Defendants removed a smaller tree adjacent to the main tree and altered the background foliage, demonstrating a broader pattern of image manipulation throughout the Documentary. The Doctored Photo, by contrast, shows what Defendants fabricated in post-production: a red spray-painted logo and "WHITES ONLY" text that do not exist. That Defendants included footage of the real tree at **7:37** — footage they nevertheless altered — while simultaneously publishing the entirely fabricated Doctored Photo at three other points in the Documentary demonstrates that Defendants knew what the tree actually looked like and made a deliberate editorial decision to fabricate an entirely different image of it. The unaltered aspects of the footage at 7:37 are, in effect, Defendants' own evidence of their fabrication.

33. The Doctored Photo was designed to create the false and defamatory impression that Plaintiffs maintain "Whites Only" signage on their land — evoking the segregation-era signs that are universally understood as symbols of illegal racial discrimination. This fabricated image was designed to suggest to viewers that Plaintiffs are engaged in illegal discrimination in violation of federal and state civil rights laws — an impression reinforced by the Documentary's narrator, who repeatedly frames the community's activities as unlawful segregation. Even if maintaining such

signage on private property would be protected speech, the fabricated photograph falsely implies that Plaintiffs are openly advertising racial exclusion in a manner that viewers would reasonably interpret as evidence of illegal housing discrimination. The fabrication is particularly egregious because Defendants did not merely add text to an existing logo — they fabricated the entire image from scratch, creating a scene that bears no relationship to any actual condition on the property.

34. The creation and publication of the Doctored Photo constitutes actual malice — a knowing falsehood — because:

- Defendants spent three days on the property and knew that no tree bore — or had ever borne — a red spray-painted RTTL logo or "Whites Only" text. Defendants nevertheless fabricated an image depicting both elements and presented it as an authentic photograph of an actual condition on the property;

- Defendants spent three days on the property and observed that no "Whites Only" signage existed anywhere;

- Defendants applied sophisticated digital manipulation techniques (bark texture overlay, edge feathering, chromatic aberration effect) specifically designed to make the alteration undetectable to casual viewers, demonstrating deliberate intent to deceive;

- Defendants presented the Doctored Photo without any disclaimer or indication of alteration, in contexts designed to maximize its impact — as the YouTube thumbnail, during an interview segment, and during the closing narration; and

- Defendants included unaltered (though still digitally manipulated in background details) footage of the actual tree with its metal cutout logo at 7:37 in the Documentary — footage Defendants themselves filmed — proving that Defendants

possessed and reviewed the true image of the tree. Their decision to fabricate an entirely different image and publish it at three other points in the Documentary demonstrates that the fabrication was knowing, deliberate, and calculated to deceive.

**False Statement No. 2 — The Misattributed X (Twitter) Post**

35. The Documentary displays a post from the X (formerly Twitter) account "@RTTL_Official" stating "We started a whites-only community" (the "X Post").

36. The Documentary presents the X Post as if it refers to the Wisdom Woods LLC property where Plaintiffs reside.

37. The X Post was made on the "@RTTL_Official" account, which is operated by the Return to the Land private membership association, a nationwide organization with over one thousand two hundred (1,200) members. The X Post was not made by Wisdom Woods LLC, Plaintiff Orwoll, Plaintiff Csere, or Plaintiff Hallowood.

38. The X Post was obviously intended as a tongue-in-cheek response to prior media defamation and an exercise of protected free speech. It was not intended to accurately describe the legal practices of any specific organization or community, and no reasonable person familiar with the context would interpret it as a literal policy statement of Wisdom Woods LLC.

39. Wisdom Woods LLC is a separate organization from Return to the Land. RTTL is an unincorporated private membership association, not a legal entity. Wisdom Woods LLC does not operate the "@RTTL_Official" X account and did not authorize, approve, or endorse the X Post.

40. Defendants knew or should have known that Wisdom Woods LLC and Return to the Land are separate organizations, because Plaintiffs explained the organizational structure to Defendant Cheshire during his visit, and the distinction is apparent from publicly available records.

41. Despite knowing the X Post was made by a separate organization and was rhetorical in nature, Defendants presented it in the Documentary as if it were a literal policy declaration by the Wisdom Woods LLC community, thereby creating the false and defamatory impression that Plaintiffs personally declared their community to be "whites-only" — a characterization that Plaintiff Orwoll specifically did not affirm when asked directly by Defendant Cheshire during the filmed interview.

### False Statement No. 3 — Misleading Editing of Interview

42. During the filmed interview, Defendant Cheshire asked Plaintiff Orwoll directly whether the community was a "whites only" place. Plaintiff Orwoll did not answer affirmatively.

43. Defendants edited the interview footage in a manner that creates the false impression that Plaintiff Orwoll affirmed the community was "whites only." Specifically, the Documentary juxtaposes Cheshire's question with selectively edited portions of Orwoll's responses, omitting context and qualifications that would have conveyed Orwoll's actual position.

44. Defendants possessed the full, unedited interview recordings and knew that the edited version misrepresented Orwoll's statements. The misleading editing constitutes actual malice — a reckless disregard for the truth.

### False Statement No. 4 — "Fortress for the White Race"

45. The Documentary's title and promotional materials describe the community as a "fortress for the white race." This characterization is presented as a factual description, not as opinion or allegation.

46. Neither Plaintiff Orwoll, nor Plaintiff Csere, nor Plaintiff Hallowood, nor any other resident used the phrase "fortress for the white race" to describe their community. This phrase was fabricated by Defendants and attributed to Plaintiffs' community.

**The Attorney General Referral and Government Investigations**

47. At the conclusion of the Documentary, the narrator states that Sky News reported the community to the Arkansas State Attorney General, who then announced that his office was "reviewing the matter."

48. The Arkansas Attorney General's statement, as quoted in the Documentary, reads: "This is the first I've heard of these allegations. Racial discrimination has no place in Arkansas or anywhere in a free society. These allegations raise all sorts of legal issues, including constitutional concerns. My office is reviewing the matter."

49. In the Written Article, Defendant Cheshire wrote that the Arkansas Attorney General "gave me this statement," confirming that Cheshire personally solicited the Attorney General's involvement — not merely that Sky News as an organization made a referral, but that the reporter who produced the defamatory Documentary personally initiated contact with the state's chief law enforcement officer for the purpose of triggering a government investigation against Plaintiffs.

50. By reporting the community to the Attorney General, personally soliciting the Attorney General's statement, and then broadcasting the Attorney General's response as part of both the Documentary and the Written Article, Defendants demonstrated that they were not merely reporting on the community but were actively seeking to trigger government enforcement action against Plaintiffs, and were successful in doing so. Multiple additional state and federal investigations have since been opened, further compounding the harm caused by Defendants' conduct.

51. This conduct demonstrates malice and an intent to cause harm beyond mere reporting.

**The Cascade of Harm**

52. The Documentary was the first major international media exposure of Plaintiffs'

community. Following its publication, a cascade of media coverage, government investigations, and lawsuits ensued, all of which trace directly or indirectly to the Documentary.

53. In August 2025, The New York Times published an article titled "One Town's Blueprint for Resegregating America," which cited the Sky News coverage and repeated many of the same characterizations.

54. In November 2025, CNN published coverage of the community, further amplifying the narrative established by the Documentary.

55. The Arkansas Securities Department opened an investigation into matters related to the community.

56. Multiple additional state and federal civil rights investigations have been opened, citing media coverage — including the Documentary — as a basis for the investigations.

57. On May 20, 2026, Michelle Walker, represented by the NAACP Legal Defense and Educational Fund, Inc., Legal Aid of Arkansas, and Relman Colfax PLLC, filed a federal lawsuit in the United States District Court for the Eastern District of Arkansas (Case No. 3:26-cv-00151-DPM) against RTTL, Wisdom Woods LLC, Plaintiff Orwoll, Plaintiff Csere, Plaintiff Hallowood, and other individuals. The Walker Complaint specifically cites the Sky News interview at paragraph 71, quoting statements attributed to Plaintiff Orwoll from the Documentary.

58. On June 5, 2026, The New York Times published a podcast episode on "The Daily" titled "One Town's Blueprint for Resegregating America," further amplifying the defamatory narrative.

## Damages

59. As a direct and proximate result of Defendants' defamatory conduct, Plaintiffs have suffered and continue to suffer the following damages:

60. **Legal fees and costs.** Plaintiffs have incurred and will continue to incur substantial legal fees and costs in defending against the Walker action, the Arkansas Securities Department investigation, multiple additional state and federal investigations, and related proceedings. These fees are estimated to exceed six hundred thousand dollars ($600,000) in the aggregate.

61. **Reputational harm.** Plaintiffs' personal and professional reputations have been severely and permanently damaged. The Documentary has been viewed nearly two million times worldwide and has been cited by major media outlets, government agencies, and litigants as establishing that Plaintiffs operate a "whites-only" community engaged in illegal and discriminatory real estate transactions in violation of the Fair Housing Act. This characterization — that Plaintiffs are selling or renting housing on the basis of race in violation of federal law — is false when examined on the facts, but appears true when the Documentary's fabricated evidence and misleading narrative are taken at face value. The Documentary's narrator reinforces this false impression throughout by framing the community's activities as unlawful segregation, creating the cumulative effect that Plaintiffs are engaged in ongoing civil rights violations. This false narrative has been adopted and repeated by subsequent media coverage, government investigators, and litigants, compounding the reputational harm.

62. **Emotional distress.** Plaintiffs have suffered severe emotional distress, including anxiety, stress, fear, and sleeplessness, arising from the multiple simultaneous government investigations and lawsuits triggered by the Documentary.

63. **Economic harm.** Plaintiffs have suffered economic harm including loss of income, inability to conduct normal business activities, diversion of time and resources to legal defense, and deterrence of prospective community members and business partners.

64. **Property value diminution.** The value of Plaintiffs' property and their interests in

Wisdom Woods LLC have been diminished by the stigma attached to the property as a result of the Documentary and the ensuing investigations and lawsuits.

65. **Risk of property loss.** If the government enforcement actions succeed, Plaintiffs face the loss of their homes and property — a direct consequence of the cascade of events initiated by the Documentary.

## CAUSES OF ACTION

### COUNT I — DEFAMATION (LIBEL)

### (Against All Defendants)

66. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the damages allegations set forth in the foregoing paragraphs.

67. Under Arkansas law, a plaintiff asserting defamation must establish: (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication of the statement; (5) the falsity of the statement; and (6) damages.

68. Defendants published, in the Documentary and the Written Article, the following false statements of fact concerning Plaintiffs, including but not limited to: (a) the Doctored Photo, which falsely depicts a tree on the Wisdom Woods LLC property bearing a red spray-painted "Return to the Land" logo and the words "WHITES ONLY," when no such signage exists or has ever existed on the property and the image was fabricated in post-production; (b) the misattribution of the "@RTTL_Official" X Post to Plaintiffs' community, falsely implying that Plaintiffs personally declared their community to be "whites-only"; (c) the misleadingly edited interview footage, which falsely conveys that Plaintiff Orwoll affirmed that the community is "whites only"; (d) the characterization of the community as a "fortress for the white race," presented as fact; and (e) the

portrayal of Plaintiff Hallowood as associated with an organization that maintains physical "Whites Only" signage on its property, when no such signage exists and the image depicting it was fabricated.

69. Each of the foregoing statements is false, as set forth above.

70. Each statement is of and concerning each Plaintiff. Plaintiff Orwoll is the primary named interview subject in the Documentary and the person to whom Cheshire posed the "whites only" question. Plaintiff Csere is named and discussed in the Documentary as "the brains behind the legal side of things." Plaintiff Hallowood is identified and portrayed in the Documentary as associated with the community, including in footage depicting the community's membership criteria. Each Plaintiff is identifiable to the audience as a person the statements concern.

71. The statements are defamatory. They expose Plaintiffs to public hatred, contempt, and ridicule and injure Plaintiffs in their business, trade, and standing in the community, including by falsely portraying Plaintiffs as engaged in unlawful racial discrimination in the sale or rental of housing in violation of the Fair Housing Act, 42 U.S.C. § 3604.

72. Defendants published the statements to third parties, specifically to an audience of nearly two million viewers of the Documentary on YouTube alone, plus additional viewers on other platforms, and to readers of the Written Article published on the Sky News website at news.sky.com. The Documentary constitutes libel because it is a fixed, published recording distributed to the public — analogous to a written publication. See Restatement (Second) of Torts § 568A. The Written Article constitutes libel because it is a written publication distributed to the public via the Sky News website.

73. Defendants published the statements with fault amounting to actual malice — that is, with knowledge that the statements were false or with reckless disregard for their truth or falsity,

including Defendants' fabrication of the Doctored Photo after spending three days on the property and observing that no such signage existed; Defendants' possession of the full, unedited interview recordings; and Defendants' knowledge that Wisdom Woods LLC and Return to the Land are separate organizations. In the alternative, and to the extent any Plaintiff is determined to be a private figure and any statement is determined to involve a matter of private concern, Defendants acted negligently in publishing the false statements.

74. As a direct and proximate result of Defendants' defamatory publications, Plaintiffs have suffered actual damage to their reputations and other actual damages, and do not rely on any presumption of damages. Without limitation, the Documentary has been viewed nearly two million times and has been cited by national media outlets, including The New York Times and CNN, by state and federal government investigators, and by the plaintiff in the Walker action, as establishing that Plaintiffs operate a "whites-only" community engaged in unlawful housing discrimination; Plaintiffs have been subjected to multiple state and federal investigations and to a federal civil-rights lawsuit that specifically quotes the Documentary; Plaintiffs have incurred legal fees and costs exceeding six hundred thousand dollars ($600,000); and Plaintiffs have suffered lost income, business disruption, diminution in the value of their real property and their interests in Wisdom Woods LLC, and severe emotional distress. These injuries constitute actual damage to reputation and actual consequential harm sufficient to satisfy the damages element of a defamation claim under Arkansas law.

## COUNT II — FALSE LIGHT INVASION OF PRIVACY

(Against All Defendants)

75. Plaintiffs reallege and incorporate by reference all of the allegations set forth above.

76. Arkansas recognizes the tort of false light invasion of privacy. To prevail, a plaintiff

must establish (1) that the false light in which the plaintiff was placed would be highly offensive to a reasonable person, and (2) that the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.

77. Defendants gave publicity to matters concerning Plaintiffs by publishing the Documentary to an audience of nearly two million viewers worldwide and by publishing the Written Article on the Sky News website.

78. The Documentary placed Plaintiffs before the public in a false light by creating the false impression that Plaintiffs operate a "whites-only" community with physical "Whites Only" signage, that Plaintiffs personally declared their community to be "whites-only," and that Plaintiffs are building a "fortress for the white race."

79. The false light in which Plaintiffs were placed would be highly offensive to a reasonable person, as it portrays Plaintiffs as engaging in illegal, discriminatory real estate transactions in violation of federal civil rights laws.

80. Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed, as evidenced by the fabrication of the Doctored Photo, the misattribution of the X Post, and the misleading editing of the interview.

81. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages as set forth above.

## COUNT III — CIVIL CONSPIRACY

(Against All Defendants)

82. Plaintiffs reallege and incorporate by reference all of the allegations set forth above.

83. Defendants Sky UK, Comcast, and Cheshire conspired and acted in concert to produce

and publish the defamatory Documentary.

84. Defendants Sky UK Limited, Comcast Corporation, and Tom Cheshire are legally distinct actors capable of conspiring with one another. Sky UK and Comcast are separate corporations, each with its own corporate existence, governance, and independent legal and economic interests, and Cheshire is a natural person. In the alternative, and to the extent Defendants are treated as a single corporate enterprise or as a principal and its agents, the individuals who fabricated and approved the Doctored Photo and who solicited the Arkansas Attorney General's involvement acted at least in part for their own personal benefit — including professional advancement, personal reputation, and notoriety — and outside the scope of ordinary, good-faith newsgathering, and therefore are not shielded by any rule precluding a corporation from conspiring with its own agents.

85. The object of the conspiracy was to produce a sensationalized documentary that would maximize viewership and engagement by portraying Plaintiffs' community in the most negative light possible, including through the fabrication of evidence and misleading editing.

86. There was a meeting of the minds among Defendants on the object and course of action, as evidenced by the coordinated production, editing, and publication of the Documentary, and the coordinated referral of the community to the Arkansas Attorney General.

87. Defendants committed one or more unlawful overt acts in furtherance of the conspiracy, including the fabrication of the Doctored Photo, the misleading editing of the interview, and the publication of the defamatory Documentary.

88. As a direct and proximate result of the conspiracy, Plaintiffs have suffered damages as set forth above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Eric Orwoll, Peter Julius Csere, and Scott Thomas Hallowood pray that this Court grant judgment in their favor and against Defendants, as follows:

A. Award compensatory damages to Plaintiffs in an amount that would fully compensate them for the injuries caused by Defendants' conduct as alleged herein, in an amount not less than one million two hundred thousand dollars ($1,200,000);

B. Award punitive damages to Plaintiffs in an amount that would punish Defendants for the willful, wanton, malicious, and reckless conduct alleged herein and that would effectively deter similar conduct in the future, in the amount of one million five hundred thousand dollars ($1,500,000);

C. Award Plaintiffs their reasonable costs of this action;

D. Order Defendants to remove the Documentary from all platforms under their control, or in the alternative, to remove or correct the fabricated Doctored Photo, the misattributed X Post, and the misleadingly edited interview segments;

E. Order Defendants to publish a retraction and correction of the false statements identified herein;

F. Order such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 22, 2026

Respectfully submitted,

Jonathan Gross

Law Office of Jonathan Gross
2833 Smith Ave., Suite 331
Baltimore, MD 21209
(443) 813-0141
jonathansgross@gmail.com
*Attorney for Plaintiffs*

## EXHIBITS

The following exhibits are attached hereto and incorporated by reference into the Complaint. Each exhibit is a true and correct copy of the document or image it purports to represent.

**EXHIBIT A — Doctored Photo at 2:08**



**EXHIBIT B — YouTube Video Thumbnail**



**EXHIBIT C — Actual Tree with Metal Cutout Logo**



**EXHIBIT D — Annotated Comparison (Doctored Photo vs. Actual Tree)**



**EXHIBIT E — Unaltered Footage at 7:37**

